**FIFTH DIVISION**
**RICKMAN, C. J.,**
**MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 21, 2021**

# In the Court of Appeals of Georgia

A21A1208. IN THE INTEREST OF A. M. B. et al., children.

PHIPPS, Senior Appellate Judge.

The mother of five-year-old A. B., three-year-old L. B., and two-year-old A. M. B. appeals from the juvenile court's order finding the children dependent and granting temporary custody to the Walton County Department of Family and Children Services (the "Department"). The mother argues on appeal that the dependency finding was not supported by clear and convincing evidence. For the reasons explained below, we agree and reverse.

This Court reviews a juvenile court's finding of dependency "in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent." *In the Interest of S. C. S.*, 336 Ga. App. 236, 244 (784 SE2d 83) (2016). In so doing, "we

neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened." Id. at 245 (citation and punctuation omitted).

So viewed, the record shows that the Department became involved with the family after the mother's former boyfriend, the father of L. B. and A. M. B., purportedly threw the mother through a wall. The Department provided the mother services and entered a safety plan for the mother to maintain stable housing and keep the children safe and away from domestic violence. The plan required the mother to live with her great aunt. She did so from September 2019 to January 2020, but then left her great aunt's house and did not follow up with the services provided by the Department. According to the mother, she left her great aunt's house because her grandmother, who also lived there, used drugs, and the mother did not want to lose her children. The great aunt, however, testified that the mother moved out after the great aunt confronted her about her new boyfriend's drug use. The mother spent the next 45 days living with her children at two separate hotels and her brother's house. She paid for the hotels with a tax refund and the help of her stepfather.

2

After being unable to contact the mother, the Department asked police to perform a welfare check on the children at the home of the boyfriend's father. Police located the mother at this house in March 2020 and arrested her for violating her probation by removing an ankle monitor;[1] she was released the following month. Following the mother's arrest, the Department asked her great aunt to pick up the children from the boyfriend's parents' house. When the great aunt picked up the children, they were all in wet diapers, smelled of urine, and were unkempt. After the mother was released from jail, she visited the children at the great aunt's house and provided diapers, clothes, and toys for the children.

According to the guardian ad litem's report, the mother and her current boyfriend were "believed" to be using methamphetamine, the boyfriend reportedly had a criminal record for child molestation and aggravated sodomy of a child, and the mother was not employed and did not have housing in her own name. The guardian detailed the children's developmental delays and cognitive challenges, including A. B.'s speech and intellectual disabilities, as well as his anemia and umbilical hernia. The guardian noted that A. B., specifically, needed a caring environment with clear

---

[1] According to the mother, she was placed on probation for a 2016 family violence misdemeanor involving her mother and a former boyfriend. In 2018, the mother removed her ankle monitor, and she was arrested for that violation.

and firm structure, limits, and boundaries given the severity of his behavioral and socio-emotional difficulties, as well as his limited language development. The guardian recommended that the children be placed in the Department's temporary custody, but remain in the great aunt's home.

On June 22, 2020, the Department filed a dependency petition seeking placement of the children with the Department. According to the petition, the children are abused or neglected and in need of court protection. The only factual support included in the petition was as follows:

> On or about February 26, 2020 the Department was notified that the mother . . . is not properly caring for or supervising any of the children. The boyfriend of the mother has been charged with child molestation and aggravated sodomy of a child in 2013 which involved a 7-year-old male child. It is reported that the mother's boyfriend . . . is on methamphetamines and it appears the mother is also using methamphetamines. The mother admitted that her boyfriend uses illegal drugs. In addition, the mother has a history of domestic violence with [the father of one of the children] in the presence of the children, and ongoing instability.

> Mother has not provided a safe, stable home or environment for the children. The mother has not provided proper parental care, control, subsistence, education as required by law, or other care or control necessary for a children's physical, mental, or emotional health or morals. The mother has failed to provide the children with adequate supervision necessary for such child's well-being.

4

At the dependency hearing, the mother testified that on May 30, 2020, approximately a month before the Department filed its dependency petition, she began living rent-free with the Culpepper family, taking care of a woman who has health issues and watching her grandchildren. The Culpeppers' house has five bedrooms and three bathrooms, including a spare bedroom where the mother's children could stay. While the mother admitted she did not have a plan if she were thrown out of the Culpepper house, she did not believe that would happen. In addition, although the mother was not employed at the time of the hearing, she claimed that the Culpeppers were going to pay her, and she also was hoping to be re-employed at Petco.

The mother's great aunt testified that, in the past, the mother lived with the children in places where there was no water or power and with individuals she did not know well; however, the great aunt did not provide dates or details for these assertions. The great aunt did not know where the mother was staying at the time of the hearing.

A psychologist who evaluated A. B. in January 2020 testified that although the child appeared a bit unkempt, there were no "red flags" concerning his safety or the manner in which he was being taken care of by the mother. He was physically

5

healthy, but his intelligence scores were significantly below average, and the psychologist was concerned about A. B.'s speech delay and behavioral issues. She recommended a caring environment with plenty of structure for A. B., as well as additional testing. In addition, she recommended a reliable, consistent caregiver. The mother testified that when the children were in her custody after moving out of her great aunt's house, she took them to all of their doctors' appointments, and the Department offered no contrary evidence.

Following the hearing, the juvenile court granted the Department's petition, finding by clear and convincing evidence that the children are dependent as provided by OCGA § 15-11-2 (22) (A) based on the mother's unstable housing and lack of employment. According to the court,

> the mother failed to provide safe and stable housing for the children. The mother does not have employment or a source of legal income. The mother previously resided in a few motels. Although the mother currently resides with the Culpepper family, this residency is an at-will circumstance: they can tell her to leave at any time and the mother has no plan if the family tells her to leave their home. In addition to her lack of stable housing, the mother has no mode of transportation, and no driver's license, and has to depend on others for transportation.

The court specifically noted that the facts presented at the hearing did not demonstrate dependency as a result of substance abuse by the children's mother. The

6

court awarded custody of the children to the Department and ordered the mother to provide names and addresses of suitable relative placements. However, the juvenile court judge acknowledged that he did not "see [the mother] taking long to get – work her case plan to get her children back." According to the judge, "the problem is basically the housing and the – [w]ell, the lack of housing and the income but [the mother] can cure that in six months." The mother timely appealed from this order.

In her sole argument on appeal, the mother asserts that the juvenile court lacked the requisite clear and convincing evidence to find that the children are dependent or that she caused any such dependency. Specifically, she asserts that there is no evidence to support a finding that the children are "abused" or that they are "neglected" based on her inability to provide proper parental care or control. We agree.

(a) Under Georgia law, "the juvenile court may place a minor child in the protective custody of the Department where the State shows, by clear and convincing evidence, that the child is a dependent child."[2] *In the Interest of H. B.*, 346 Ga. App.

---

[2] Given the similarities between the definition of a "deprived child" under the former Juvenile Code and that of a "dependent child" under the current Juvenile Code, "our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child." *In the Interest of S. C. S.*, 336 Ga. App. at 244, n. 4.

7

163, 164 (1) (816 SE2d 313) (2018) (citation, punctuation, and footnote omitted); see also OCGA § 15-11-180 (providing that the petitioner bears "the burden of proving the allegations of a dependency petition by clear and convincing evidence"). As relevant here, OCGA § 15-11-2 (22) (A) defines a "dependent child" as a child who, among other things, "[h]as been abused or neglected and is in need of the protection of the court." "That definition focuses upon the needs of the child regardless of parental fault. The [dependency] petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to [dependency] that is the issue." *In the Interest of A. J. H.*, 325 Ga. App. 848, 851 (755 SE2d 241) (2014) (citation and punctuation omitted).

As relevant here, the Code defines the term "abuse" as "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child; . . . [e]motional abuse; [or] [t]he commission of an act of family violence . . . in the presence of a child." OCGA § 15-11-2 (2) (A), (B), (E). "Neglect," in turn, is defined as "[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals." OCGA § 15-11-2 (48) (A).

8

When determining whether a child is without proper parental care or control, courts must consider factors such as "[e]gregious conduct or evidence of past egregious conduct of a physically, emotionally, or sexually cruel or abusive nature by [a] parent toward his or her child or toward another child of such parent" and "[p]hysical, mental, or emotional neglect of [the] child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent." OCGA § 15-11-311 (a) (4), (5). In making its determination, a juvenile court may consider evidence of past conduct, but "the record must contain evidence of present dependency, not merely past or potential future dependency." *In the Interest of T. Y.*, 357 Ga. App. 189, 196 (1) (850 SE2d 244) (2020) (citation and punctuation omitted); accord *In the Interest of M. S.*, 352 Ga. App. 249, 258 (834 SE2d 343) (2019); *In the Interest of G. R. B.*, 330 Ga. App. 693, 700 (769 SE2d 119) (2015). The juvenile court's findings in this case fall far short of presenting clear and convincing evidence of present dependency.

We first note that it is obvious from the juvenile court's order that its finding of dependency is based on neglect; there is no mention in the order of any physical injury or emotional abuse, and the juvenile court did not conclude that an act of family violence occurred in the presence of the children. Rather, the court's order

9

specifically notes that the dependency finding is based on the mother's unstable housing and lack of employment.[3] Nonetheless, even though we have given the court's findings of fact the appropriate deference, the record lacks clear and convincing evidence to support the court's conclusion that the children presently are neglected within the meaning of OCGA § 15-11-2 (48) (A).

The juvenile court concluded, without detailing factual support in its order, that the children are dependent because the mother "failed to provide safe and stable housing for the children." However, the record does not contain any evidence that the mother's past housing issues rose to the necessary level of present "egregious conduct" or amounted to present "physical, mental, or emotional neglect" of the children. See OCGA § 15-11-311 (a) (4), (5). In addition, the juvenile court based its decision of present dependency on the facts that the mother's living arrangement with the Culpeppers is "at-will" and the mother does not have a plan if the family tells her to leave their home. However, these findings by the juvenile court merely establish

---

[3] The Department argues that the juvenile court based its dependency conclusion on the mother's "long-term instability and relationships with men who were potentially dangerous to the children." However, the court's order does not state that the finding of dependency is based on either of these factors, and, in fact, the juvenile court judge specifically acknowledged at the hearing that he believed the mother could cure the problem at issue – her lack of housing and income – in six months.

a speculative possibility of future dependency, and "a dependency determination cannot be based solely on speculation that the child might be dependent in the future." *In the Interest of M. S.*, 352 Ga. App. at 262. While the juvenile court's order in this case arguably references past dependency – albeit without any factual support – and plainly references the possibility of future dependency, the order does not establish the required present dependency by clear and convincing evidence. See *In the Interest of T. Y.*, 357 Ga. App. at 197-198 (1).

"Although the mother has had trouble finding stable housing, the record indicates that she has made efforts to reach out and receive assistance, and she ultimately located a suitable house for her and the child[ren]." *In the Interest of V. G.*, 352 Ga. App. 404, 409 (1) (a) (834 SE2d 901) (2019). In fact, "[t]he mother testified at the dependency hearing that [the Culpeppers] could provide the children with housing, at least temporarily. As a result, the juvenile court's finding that the mother is unable to provide stable housing for the child[ren] is contrary to the evidence." Id. See also *In the Interest of E. M.*, 264 Ga. App. 277, 281 (590 SE2d 241) (2003) (reversing deprivation finding where "[t]he evidence show[ed] without contradiction that, albeit with the assistance of others, the father had always managed to put a roof over his son's head and that, at the time of the deprivation hearing, he had found a

11

house in which he and [his son] could live, at least temporarily."). Given the testimony at the dependency hearing, we find no clear and convincing evidence of neglect based on the mother's lack of stable housing.

We likewise find no clear and convincing evidence of neglect based on the mother's lack of stable income or failure to have a driver's license or vehicle. See generally *In the Interest of C. J. V.*, 323 Ga. App. 283, 287 (746 SE2d 783) (2013) ("poverty alone is not a basis for termination") (citation and punctuation omitted). While the mother was not employed at the time of the hearing, there is no evidence in the record that her lack of employment has negatively affected her parenting ability or caused her to neglect her children, and even the juvenile court judge noted that the mother should be able to "cure that in six months." The mother testified that she received food stamps and had worked in the past at Petco, on chicken farms, and cleaning houses. She believed she would be re-hired at Petco and would be paid for her work at the Culpepper house. As for the court's emphasis on the mother's lack of a driver's license or mode of transportation, again, there is no evidence in the record that these issues have prevented the mother from caring for her children or getting them to doctors' appointments.

(b) While the definition of dependency focuses on the needs of the children and not who is responsible for the conditions that amount to dependency, "a finding of parental unfitness" nevertheless "is essential to support an adjudication of present [dependency]." *In the Interest of D. H. D.*, 289 Ga. App. 32, 34-35 (656 SE2d 183) (2007) (citation and punctuation omitted).

> [A] juvenile court is not authorized to remove a child from a parent, even temporarily, unless clear and convincing evidence exists that the dependency resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.

*In the Interest of V. G.*, 352 Ga. App. at 412 (1) (b) (citation and punctuation omitted). It is only under compelling circumstances found to exist by clear and convincing proof that a court may sever the parent-child custodial relationship because "the right to the custody and control of one's child is a fiercely guarded right in our society and in our law." *In the Interest of M. S.*, 352 Ga. App. at 258 (citation and punctuation omitted).

Here, the juvenile court found that the mother failed to secure stable housing and a source of income. Although the mother's inability to do so in this case "serves neither her nor her [children's] best interests, it in no way constitutes intentional or

13

unintentional misconduct resulting in abuse or neglect of the [children]." *In the Interest of V. G.*, 352 Ga. App. at 412 (1) (b) (citations and punctuation omitted); accord *In the Interest of E. M.*, 264 Ga. App. at 281. And the record before us is devoid of evidence that the mother lacked proper parenting skills or that the children were not being properly cared for. In fact, none of the presented evidence reflected poorly on the mother's present parental fitness or the children's health. Even the psychologist called by the Department testified that although A. B. was a bit unkempt, he was physically healthy and there were no "red flags" concerning his safety or the manner in which he was being taken care of by the mother.

Viewed in a light most favorable to the juvenile court's judgment, the record in this case lacks evidence – much less clear and convincing evidence – to support the court's conclusion that the children presently are dependent within the meaning of OCGA § 15-11-2 (22). Moreover, the evidence is wholly insufficient to establish that the mother is unfit. The record shows that the mother is willing to provide her children with the care that the law requires, even reaching out for assistance when necessary. And the Department presented no evidence that the children have suffered any harm or ill effects at the hands of their mother. Consequently, the juvenile court

erred in finding the children dependent and transferring custody of the children from the mother to the Department.

*Judgment reversed. McFadden, P. J., concurs; and Rickman, C.J., concurs in judgment only.*